## CUTTER v. IOWA WATER CO. et al.

### (Circuit Court, S. D. Iowa, E. D. March 8, 1904.)

### No. 219.

1. CORPORATIONS—REGULARITY OF FORECLOSURE PROCEEDINGS—ALLEGATIONS OF FRAUD BY BONDHOLDER.

A bill by a bondholder of a water company, filed a year and a half after the conclusion of a foreclosure suit, in which the property of the company was purchased by a committee of the bondholders, and afterward sold by such committee for the benefit of all bondholders who joined in the plan of reorganization, seeking to obtain full payment of complainant's bonds from the sum so received for the property, does not state a cause of action, where, although fraud is alleged, no facts are pleaded to substantiate the charge, and where it appears from the bill that plaintiff was cognizant of the entire proceedings, except as to the amount the committee received on the resale of the property, and made no objection thereto, and that he was fully advised by circulars sent by the committee of the facts existing and the proposed action, and solicited to join therein.

2. SAME—PURCHASE BY REORGANIZATION COMMITTEE.

That a number of the bondholders of a defaulting water company voluntarily constituted themselves a reorganization committee, and acted for themselves and all other bondholders who saw fit to join them, in looking after foreclosure proceedings, and in the purchase of the property therein, does not affect the validity of the proceedings or sale to give a nonjoining bondholder any greater rights.

3. SAME.

In a foreclosure suit against a corporation by a mortgage trustee, in which the proceedings were directed by a committee of the bondholders, who also purchased the property on behalf of themselves and other bondholders joining with them, the fact that not all of the bonds were formally proved, where their existence is undisputed, does not affect the validity of a decree for the amount represented by all, nor give a bondholder who proved his bonds a right in equity to have the proceeds of the property divided between the bonds so proved to the exclusion of all others.

4. EQUITY—PLEADING—ALLEGATIONS TO AVOID DEFENSE OF LACHES.

To avoid a defense of laches, general allegations in a bill that the fraud on which it is based was not sooner discovered are not sufficient, but there must be allegations and evidence showing what the complainant did, and which establish his diligence.

## In Equity. On demurrer to amended bill.

This case is pending on an amended bill in equity and demurrers filed by defendants. From the amended bill it appears that the defendant water company owned a system of waterworks at Ottumwa, Iowa. April 15, 1887, it executed 400 of its mortgage bonds, of $1,000, each bearing 6 per cent. interest, payable semiannually, secured by a mortgage on its property, rights, franchises, which mortgage was made to the defendant trust company. Of

¶ 4. See Equity, vol. 19, Cent. Dig. § 329.

these bonds but 349 were issued or outstanding, of which complainant owns 15. The company having defaulted in its interest, the trustee filed a bill in this court in July, 1894, to foreclose the mortgage, and defendant Brownell was appointed receiver and managed the property and received the income until September, 1897. The defendants Potter, Smith, Sanford, and Mills were a self-selected committee, who had the oversight and directed the trust committee in the foreclosure case. The committee issued a circular to all bondholders, inviting them to join with them, deposit their bonds with the trust company, take certificates therefor, join in the foreclosure, and bid at the sale, and, if the purchaser, take certificates showing their proportionate ownerships. Many other things were set forth in the circular, all tending to the reorganization, and, as is usual in such cases, the case was referred to a master, who heard the case, who made a report, and the case went to a decree of foreclosure in February, 1897. The amount found due on the 349 outstanding bonds was $349,000 principal and $69,810 interest, aggregating $418,810. The committee, to depreciate the value of the assets and prevent bidders, prevailed upon the trust company, and in collusion with it, to attack the validity of the appointment of the receiver and all his acts, claiming them to be void, which was by the court overruled; and, for the like purpose of depreciating the value of the assets, the committee in June, 1897, issued another circular, setting forth the advantages offered by reason of the size, location, etc., of the city of Ottumwa, the upset price to be bid, as per the terms of the decree, and that $12,379.68, costs of the case, and receiver's certificates of $21,500, aggregating $33,879.68, would have to be paid in cash by the reorganization committee, if it were the successful bidder. Later on, viz., July 6, 1897, the committee issued another circular addressed to the bondholders. The sale was advertised for July 10, 1897, but in fact took place July 12, 1897, subject to a prior mortgage to a Boston company, when in fact the mortgage to the Boston company was on but part of the property, and the property not covered by the mortgage to the Boston company had cost $430,000. The decree of foreclosure was drawn by counsel for the committee, with the aid of counsel for the trust company, so as to allow indefinite and unknown claims to be asserted against the fund arising from the sale, and was so drawn as to leave uncertain the amount of the incumbrances on part of the property. The sale was for $75,100, which went to deed to the committee, and was approved by the court. The master and court allowed unproven bonds and unproven coupons. While the receiver had the property he received $110,438.39, and disbursed $108,975.60, leaving $1,507.79, which was paid over to the committee, and in no way accounted for, and which was revenue of the property, subject to the payment of the bonds of complainant. The price bid was, as above stated, $75,100, of which $21,799.17 represented expenditures of the receiver for permanent improvements, leaving $53,300.83 actually bid for property which had cost more than half a million, with annual earnings of about $30,000. The said bid was the nominal amount of the sale only. Prior to the sale the said committee and the trust company, acting in collusion, had arranged for a sale to the defendant City Water Supply Company for $524,000, and did convey the plant to it for a consideration of $524,000, which sum the committee appropriated to its own use, all in connivance with the trust company. The defendants deny that plaintiff has any rights excepting to the $1,538.79. There were only 44 bonds, including 15 of plaintiff's, that were proven up in the case. Complainant had no knowledge of the turning over of the $1,507.79 until just before this case was brought, nor did he have actual knowledge that the consideration of said sale was for $524,000 until said case was disposed of. The prayer of the bill is for an investigation as to the alleged frauds, and that complainant's interest be fixed as $15/44$ of the purchase price of the property, including said sum of $1,507.79, and that the purchase price be declared to be $524,000, and not $75,000, and that complainant's interest is $15/44$, or such other share as may seem equitable, up to a sum sufficient to pay his bonds, principal and interest, and for judgment accordingly, concluding with a general prayer for equitable relief.

It is not necessary to recite the several demurrers. They raise the question as to the sufficiency of the amended bill and complainant's right to recover.

W. E. Blake, for complainant.
W. A. Underwood and William McNett, for defendants.

McPHERSON, District Judge (after stating the facts as above). The bill, being as hereinbefore stated, is insufficient, more for what it does not state than for what is alleged. There is no one allegation of fact, of anything fraudulent, that either the committee or the trust company was guilty of. The word "fraudulently" is used many times, but in what it consisted is not made known. The one possible exception to this will be noticed later on.

It is not alleged that there was one untruthful statement in any of the three circulars sent out to the stockholders, including complainant. A reading of the circulars impresses me with the belief that they are just what should have been sent out, as a plain statement of facts of the situation; and whether they tended to depreciate or enhance the selling price of the property is not material, unless it is material for a committee to suppress the truth. The attack made by the trust company on the acts of the master is not made to appear to have been detrimental to complainant or any one. The truth is, as all connected with this case well know, that it was not only a debatable but a serious question whether the attack was not justifiable, owing to the fact that the wife of the judge and the wife of the master were sisters. See Opinion by Judge Thayer in Trust Company v. Water Company (C. C.; in the original case herein) 80 Fed. 467. It was entirely proper that the question was presented.

It is not alleged that the receiver did any act but that he promptly reported it to the court, and that the court approved his acts. It is not alleged that complainant did not have full knowledge of anything and everything that was done in the case from first to the conclusion, excepting as appears near the end of the foregoing statement of facts. It is not alleged that plaintiff at any time complained either to the committee or to the trust company of what was being done, or that he ever complained, by motion or otherwise, to the court. So far as appears, he sat idly by, and allowed the committee and trust company to proceed, expending their time and money to obtain the foreclosure, sale, and reorganization. Whether complainant could have intervened need not be decided. In fact, that question cannot now be decided, because such interventions are, in a measure at least, discretionary. But he could have offered to intervene, or at least in some way gotten the facts before Judge Woolson, then presiding. The amended bill is silent as to all these matters. The amended bill does not allege that the sale to the defendant supply company was for money, or that it was an exchange for certificates or bonds in the new company. The amended bill does not allege whether the earnings of the plant of $30,000 per annum were gross earnings or net earnings. Nor does he allege that he is denied his right to the $1,500 or more now on hands with the committee. On the contrary, it appears that they are willing for plaintiff to have it, as they concede it to him.

As to the allegation that only 44 bonds were "proven," it is not alleged that there was any deceit or fraud practiced on the court.

On the contrary, it is alleged that there were $349,000 of bonds outstanding, all which plaintiff now affects to believe would be in harmony with honesty and fair dealing to cut out, excepting as to $44,000, including $15,000 of his own.

The amended bill is entirely silent as to who participated in the reorganization, or the sale or change of title over to the City Water Supply Company. All that is made known is that plaintiff did not. He was invited to join and participate, but probably did not because to do so he would have had to contribute in money his share of the foreclosure expenses and to take up the receiver's certificates.

Assuming that the stock was of no value, and that the property as of right belonged to the bondholders, he owned the proportion or share of 15 divided by 349. But now he says without having contributed to the expense of bringing about the sale, or taking up the receiver's certificates, he should own a proportion or share represented by 15 divided by 44, or practically one-third, at least up to the face value of his bonds and interest coupons; and this at the expense of bondholders as innocent of wrongdoing as plaintiff can claim to be. To convince one that such a claim is grossly inequitable, the facts need only be stated, and an argument thereon need not be made.

Something over $1,500 is awaiting plaintiff, as his amended bill makes plain; and, if that is but a small return for his investment, it is because of his mistake, with all others, in investing in the original enterprise. And, if he does not have an interest in the reorganized company, it is because he preferred to stay out and avoid further investment. Be all this as it may, after standing out, incurring no further expense, knowing practically all that was being done, he now has no right to say that his bonds must be paid in full by the holders of $334,000 of other bonds.

The allegation that the committee was self-appointed is of no importance. Such committees, and such sales to a reorganization committee, are usual, and such plans have been recommended by the courts. Wetmore v. Railroad (C. C.) 3 Fed. 177–189, by Justice Miller; Vose v. Cowdrey, 49 N. Y. 336; Thornton v. Railroad, 81 N. Y. 462; Shaw v. Railroad, 100 U. S. 605, 25 L. Ed. 757; Bound v. Railroad (C. C.) 71 Fed. 53; Armour v. E. Bement's Sons (C. C. A.) 123 Fed. 56.

Plaintiff had his election whether to join or stay out. He and his friends had the right to bid. The upset price was fixed by the court. The sale was for that amount, and it was approved by the court. And, if all that is charged be true, they were only irregularities, subject to correction in that case, on proper proceedings. And this is not a bill of review, and it was so disclaimed at the argument. And I do not stop to discuss whether the recovery of the $1,500 can be had by an action at law or in equity. Plaintiff concedes that this is offered to him, and has never been denied him. But this action is not for a recovery of that; and, if that were attempted by amendment, the bill most clearly would be multifarious.

But the plaintiff says he had no notice of the $1,507.79 until just before this suit was brought. He also says that he had no actual notice of the consideration of the transfer to the new company until

the case was disposed of. The original bill herein was filed November 2, 1898, or a year and a half after the last transaction complained of, and much longer, after many things done. He pleads conclusions only, and states no facts showing diligence, or why he did not know such facts at an earlier day. In some respects, and oftentimes by analogy, the doctrine of laches is like the statute of limitations.

Both Indiana and Iowa have a statute, one copied from the other, that an action founded on fraud shall not be barred until five years after the fraud is discovered. But the Supreme Court in Wood v. Carpenter, 101 U. S. 135, 25 L. Ed. 807, in construing the Indiana statute, held that the general allegations or general proofs that the party had not earlier discovered the fraud is not sufficient. There must be allegations and evidence showing what he did to discover the fraud, and a showing why he did not discover it. The same rule should, and no doubt does, apply to the doctrine of laches.

Plaintiff knew of the circulars, of the committee and its purchases, of the attack upon the master's acts; of the foreclosure and upset price, and practically everything before the transfer of the title. But he remained silent until long after the whole situation is changed. He should now remain silent.

In passing upon the case I have not deemed it necessary, even if proper, to consider the history of the case, as shown by the original bill, proceedings in the main case as appears from the records of this court, and those of the Circuit Court of Appeals or of the Supreme Court. Nor have I considered the question, either of duty or propriety, of following the rulings of the judge who passed upon the original bill. But only considering the amended bill, independently of the original bill, and independently of the history of this matter, either as to what preceded or what followed, in my judgment it is without merit.

The several demurrers will be sustained.